EVANS BOWERS
Stacey G. Evans (*Pro hac vice* application forthcoming)
sevans@evansbowers.com
Ryan E. Harbin (*Pro hac vice* application forthcoming)
rharbin@evansbowers.com
J. Amble Johnson (*Pro hac vice* application forthcoming)
ajohnson@evansbowers.com
729 Piedmont Ave NE
Atlanta, GA 30308
Tel.: (404) 850-6750

SPERTUS, JOSEPHS & MINNICK, LLP
Samuel A. Josephs (SBN 284035)
sjosephs@spertuslaw.com
Payton J. Lyon (SBN 305763)
plyon@spertuslaw.com
617 West 7th Street, Suite 200
Los Angeles, California 90017
Telephone:   (213) 205-6520
Facsimile:   (213) 205-6521


Attorneys for Plaintiff Dr. Mahendra Amin, M.D.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., | Case No. 2:25-cv-11489 |
| Plaintiff, | **COMPLAINT FOR DEFAMATION** |
| v. | **DEMAND FOR JURY TRIAL** |
| SAGE PUBLICATIONS, INC., | |
| Defendant. | |

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

Plaintiff, Dr. Mahendra Amin, M.D., hereby states his complaint for defamation against Defendant Sage Publications, Inc. ("Defendant") as follows:

**INTRODUCTION**

1.     This Complaint arises from Defendant's December 4, 2024, publication of a book titled *Slippery Eugenics: An Introduction to the Critical Studies of Race, Gender and Coloniality*, and which includes a section containing multiple false and defamatory statements of and concerning a private figure, Dr. Mahendra Amin, M.D., which accuse him of performing fifty-seven (57) hysterectomies that were not medically necessary and were conducted without consent on immigrant women detained by the United States Immigration and Customs Enforcement ("ICE") at the Irwin County Detention Center ("ICDC").

2.     In the fall of 2020, an ICDC nurse named Dawn Wooten made false allegations that Dr. Amin performed mass hysterectomies on women detained at ICDC.

3.     Wooten did not observe Dr. Amin's treatment and her accusations of mass hysterectomies were widely and definitively discredited prior to the book's publication.

4.     The book falsely portrays Dr. Amin as having "forcibly sterilized fifty-seven" women detained at ICDC whom he saw as an outside physician.

5.     The book also alleges that a whistleblower and five gynecologists concluded that Dr. Amin "exaggerated the risk of different health conditions to justify the hysterectomies."

6.     The false and defamatory statements in the book convey to the average reader that Dr. Amin was an evil doctor seeking to carry out a sterilization campaign on immigrant women detained at ICDC as a part of "a long history" of "control and management of people's reproduction" as part of "a racializing, ableist, classist, and gendered logic."

1

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

7.     The statements and insinuations leveled toward Dr. Amin were reckless, vile, and devoid of any decency or concern for Dr. Amin's reputation and livelihood.

8.     The statements are false and discredited.

9.     The statements have been false and discredited since Wooten's allegations were originally reported on, with multiple media outlets and investigations reporting that Wooten's allegations of mass hysterectomies were not accurate, years before the publication of the book.

10.     Dr. Amin performed only two hysterectomies on patients from ICDC.

11.     Both hysterectomies were medically necessary.

12.     In both instances, the patients were informed and consented to the procedures, as documented by witnesses and signed informed consent forms.

13.     In both instances, ICE conducted an independent review of the treatment plans and approved the procedures.

14.     Not even the book's alleged nurse source ever claimed Dr. Amin performed 57 hysterectomies.

15.     There are no sources to support the book's false and defamatory allegations that Dr. Amin performed 57 hysterectomies.

16.     Indeed, all procedures Dr. Amin performed for ICDC patients were medically necessary; done with patient knowledge and consent, as demonstrated by signed forms indicating informed consent; and approved by ICE's independent preapproval process that must be completed prior to any medical procedure on a patient.

17.     The false and defamatory statements assassinated Dr. Amin's character and damaged his reputation as a physician.

18.     Defendant chose to chase a false narrative that supported its thesis that the "long history" of control over others' reproduction "continues to this day in different areas around the world including in the United States of America," at the

2

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

1  expense of Dr. Amin, a private individual, a good and trusted doctor—an

2  immigrant himself—who has dedicated his life to providing quality healthcare

3  services for marginalized and underserved communities.

4      19.    Defendant published these false statements well after it was clear that

5  Wooten's allegations regarding Dr. Amin had been disproven, which Defendant

6  knew or should have known by the time the book was published. As a result of the

7  conduct described herein, Defendant has crossed the threshold from speech

8  protected by the First Amendment to actionable defamation, for which it must be

9  held legally accountable.

10                                **PARTIES**

11      20.    Dr. Amin is an individual who resides in Douglas, Coffee County,

12  Georgia, and is a citizen of the State of Georgia.

13      21.    Sage Publications, Inc. ("Sage" or "Defendant") is a Delaware

14  corporation registered to do business in California and whose principal address is

15  located at 2455 Teller Rd, Thousand Oaks, CA 91320.

16                        **JURISDICTION AND VENUE**

17      22.    Plaintiff Dr. Amin is a citizen of the State of Georgia for the purposes

18  of diversity jurisdiction under 28 U.S.C. § 1332.

19      23.    Defendant Sage is a citizen of Delaware and California for the

20  purposes of diversity jurisdiction under 28 U.S.C. § 1332.

21      24.    This Court has original jurisdiction of this action pursuant to 28 U.S.C.

22  § 1332, as there exists complete diversity of citizenship between Dr. Amin and

23  Sage and the amount in controversy exceeds $75,000, exclusive of interest and

24  costs.

25      25.    Sage is subject to the personal jurisdiction of this Court, and venue is

26  appropriate in this Court, because Sage's main office is located at 2455 Teller Rd,

27  Thousand Oaks, CA 91320.

28

                                    3
*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

1

## **FACTUAL BACKGROUND**

2      26.    Dr. Amin was born, raised, and completed medical school in India.

3      27.    Dr. Amin grew up very poor, living in homes with dirt floors.  But his

4   parents sacrificed to help him through medical school.  His parents sold the only

5   land they owned and borrowed money to make sure he could finish his education.

6      28.    Dr. Amin lived up to his parents' sacrifice, becoming one of only 8 out

7   of 300 medical student hopefuls who could ultimately enroll in medical school from

8   his district in India.

9      29.    When Dr. Amin first came to the United States, he worked in a New

10  York City subway store and sold newspapers in Brooklyn, working twelve hours a

11  day, six days a week, all while studying for additional medical exams required of

12  foreign students.

13     30.    Dr. Amin completed his Residency in Gynecology in the United States

14  and has been licensed to practice medicine in Georgia for nearly forty years.

15     31.    Dr. Amin remembers his humble beginnings and the power of

16  someone sacrificing so that others can have a better future.  That is why he has

17  practiced in underserved areas nearly his entire medical career.

18     32.    Over the course of his medical career, on a regular basis, he has

19  worked 36-hour shifts, seen over sixty patients in a day, and delivered over 400

20  babies in a year.

21     33.    He has often worked for free and for many years, he kept regular daily

22  office hours and performed hospital surgeries at night, all to ensure that—as much

23  as he could prevent it—no one who needed care would go without it.

24     34.    Dr. Amin regularly treats uninsured patients (some who drive over 100

25  miles to see him) and accepts whatever patients can pay in return.

26     35.    He never turns away a patient for inability to pay.

27     36.    He regularly treated patients in area jails because he knows that if he

28  does not provide treatment, it is likely the patients will go without it.

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA  90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

4

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

37.     At least prior to 2020, Dr. Amin was the sole OB/GYN physician in Irwin County, Georgia.  At the present time, Dr. Amin is one of only two OB/GYN physicians in Irwin County, Georgia.

38.     Many of Dr. Amin's patients fall below the poverty line and are on Medicaid.

39.     Dr. Amin provides medical care to patients at a local health clinic at least once per week on a voluntary basis.

40.     Before Wooten first made false allegations that he was conducting mass hysterectomies and sterilizations without consent, Dr. Amin provided gynecological medical services to patients detained at ICDC.

41.     In the early to mid-1990s, Irwin County Hospital was on the brink of closing its doors.  Dr. Amin put up his own money, hired a management team, and kept the hospital alive.  Indeed, the hospital improved with Dr. Amin's leadership—adding more patient rooms and several other upgrades.

42.     On his rare weekends away, Dr. Amin remains "on call" and instructs his nursing staff to call him if any of his patients go into labor so that he can return and deliver the babies and care for their mothers.

43.     Dr. Amin loves this country and all it has afforded him, and he is determined to give back.

44.     He is devoted to medicine and to providing care to underserved communities.

## SAGE PUBLICATIONS, INC.

45.     Sage Publications, Inc., is an international academic company that publishes books, journals, and library resources.  Sage is an independent publisher that bills itself as "committed to a mission of 'building bridges to knowledge'" by supporting emerging fields of study and by encouraging and advocating for critical thinking, academic freedom, and social justice.

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

5

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

46.    Sage has multiple imprints under its umbrella.  Sage also publishes "series" of books that have common themes and messages.

47.    One of these "series" is the "Social Science for Social Justice Series," which Sage describes as "a book series from Sage that provides a platform for academics, journalists, and activists of color to respond to today's pressing social issues."

48.    Sage further contends that this series "challenges the Ivory Tower of academia – in which Black, Asian and minority ethnic voices are underrepresented – by defining the 'expert' not as someone who extracts data from a community, but someone who works within and alongside communities, gives back, and amplifies voices."  Sage also contends this series "is interdisciplinary and international in scope, and provides rigorous analysis and radical thinking in clear language that is accessible to readers both within and outside of academia."

49.    On December 4, 2024, Sage published the book underlying this suit: *Slippery Eugenics: An Introduction to the Critical Studies of Race, Gender and Coloniality*.

50.    The book is part of the "Social Science for Social Justice" series.

### DAWN WOOTEN'S MEDIA CAMPAIGN AND HER ACTUAL COMPLAINT; TWO DIFFERENT THINGS

51.    On September 14, 2020, Project South, an organization that portrays its mission as "eliminating poverty and genocide" and "cultivating strong social movements," sent a letter to the media which purported to be addressed to the Department of Homeland Security, the ICE Atlanta Field Office, and the ICDC ("letter").

52.    Dawn Wooten, a nurse who had worked at the ICDC, was the letter's main source.  With its release, Wooten went on a media campaign as the face of the letter.

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

53.     As the alleged source of the information contained in the letter, Wooten did not seek to be anonymous and did not seek any other protections that could be afforded to true whistleblowers who file formal complaints.

54.     Wooten sought the limelight, giving numerous print and television interviews and even going so far as to solicit funds through GoFundMe campaigns which have generated over $100,000 in donations to date.

55.     The letter contained allegations regarding conditions at the ICDC, mostly relating to COVID-19.  The letter also contained allegations of high rates of hysterectomies at ICDC.

56.     The letter was not part of a complaint filed in any court or submitted as part of any administrative proceeding.

57.     Wooten did not file the letter in the Department of Homeland Security Office of Inspector General's whistleblower web portal.

58.     Wooten filed an actual, but *separate* complaint in which she alleged she had been retaliated against by her employer as a consequence for sharing concerns about the ICDC's failure to adhere to COVID-19 protocols and protections.

59.     This *actual* "whistleblower complaint," which was filed through the whistleblower web portal system, contained zero allegations about hysterectomies and not a word about care from any gynecologist.

60.     The truth is that medical records that Wooten had access to did not show mass hysterectomies were performed on women detained at ICDC.

61.     There are no medical records showing a lack of consent for any hysterectomy performed by Dr. Amin on any woman detained at ICDC.

62.     Instead, the medical records show that Dr. Amin performed only two hysterectomies, both with consent, on women detained at ICDC.

63.     Further, Wooten never accompanied any women detained at ICDC to medical appointments with Dr. Amin or any other physician outside the ICDC.

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

64.    To date, Wooten has ***never*** identified any women who she claimed received an unconsented-to hysterectomy.

### WOOTEN'S ALLEGATIONS DISCREDITED

65.    Although the letter did not identify Dr. Amin by name, as the only doctor providing gynecological treatment to ICDC patients outside of ICDC, his identity was immediately discernible.

66.    A few outlets, including MSNBC and Prism, quickly identified Dr. Amin by name and reported on the accusations in the letter.  Many other outlets, however, noted that the allegations had not been corroborated and identified reasons to doubt the allegations.

67.    Indeed, only one day after the letter was sent, it was confirmed that Dr. Amin had performed only two hysterectomies on ICDC patients.

68.    ICE also confirmed that patient consent and independent preapproval are secured before all procedures on women detained by ICE, including the ICDC patients.

69.    It is beyond reasonable belief that detainees in an ICE facility, such as ICDC, could undergo surprise hysterectomies without consultation and consent.

70.    Indeed, an ICDC patient would not even be referred to a health care provider outside of ICDC such as Dr. Amin without requesting treatment, ICDC staff referring the patient to the outside provider, and the patient voluntarily undertaking the treatment.

71.    ICE performs an independent review for all surgical procedures and issues its approval or denial for such procedures.

72.    This review process requires ICDC to review a patient's medical records and determine if the requested procedure is medically necessary.  The process typically takes around two weeks.

73.    Dr. Amin has never performed a procedure on an ICDC patient without going through this process.

8

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA  90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

74.    ICE provided such review and approval for both hysterectomies that Dr. Amin performed on ICDC patients.

75.    Several independent physician reviews of those procedures confirmed that the procedures were medically necessary.

76.    Signed medical consent forms, for the hysterectomies as well as all the procedures Dr. Amin performed on ICDC patients, confirm that all procedures were discussed and consented to by ICDC patients.

77.    Dr. Amin always obtains informed consent from his patients.

78.    Dr. Amin utilizes interpreters when treating patients who do not speak or understand English.

79.    When Dr. Amin treated ICDC patients, he was supervised by at least one other person.  This was a matter of protocol.

80.    Dr. Amin has never abused any patient.

81.    After an initial wave of media coverage, the news cycle moved on to other stories, as journalists were unable to substantiate Wooten's allegations and/or found evidence to contradict them.

82.    Of the outlets that continued to publish about Wooten's allegations, many published information tending to contradict the hysterectomy allegations.

83.    For example, on September 17, 2020, only two days after publishing its article identifying Dr. Amin, Prism published an article in which it relayed that many Douglas residents viewed Dr. Amin as a "pillar in the community;" that Wooten was "complicit" in the mistreatment immigrants suffered at ICDC, with which Dr. Amin had no involvement; that one patient in the community asked Dr. Amin to perform a hysterectomy on her but he declined to do so and that the same patient said Dr. Amin provided her free care when her insurance lapsed and otherwise worked with her to provide care; that "an associate in the medical field" said that "[t]here is no way this was being done under the radar and without a paper trail;" and that likewise the deputy secretary of the Department of Homeland

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA  90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Security said that "his agency has not seen any payments or requests for payment for the hysterectomies Amin allegedly performed, and that it is 'virtually inconceivable that any of this could have been going on without multiple sets of records.'"

## INVESTIGATIONS CONFIRM NO MASS HYSTERECTOMIES OR STERILIZATION

84.    Following Wooten's jaw-dropping allegations and the ensuing media coverage, multiple government bodies investigated.

85.    No investigation corroborated Wooten's allegations of mass hysterectomies.

86.    No investigation resulted in any penalty against Dr. Amin.

87.    The Georgia Composite Medical Board cleared Dr. Amin of wrongdoing and allowed him to continue practicing medicine, which he still does.

88.    An investigation of a Senate subcommittee confirmed that only two hysterectomies were performed, both approved by ICE as medically necessary.

89.    That same Senate subcommittee stated that Wooten's hysterectomy allegations were "false."

## SLIPPERY EUGENICS

90.    On December 4, 2024, years after Wooten's claims were discredited, Defendant published *Slippery Eugenics: An Introduction to the Critical Studies of Race, Gender and Coloniality* ("Slippery Eugenics" or "book").

91.    The book's author, Dr. R. Sanchez-Rivera, says the book "highlights the global interconnectedness of eugenic ideas and practices historically, as well as how the legacies and continuations of eugenics are manifested through state policies and individual self-regulation."

92.    Dr. Sanchez-Rivera also says the book "illustrates how internalized eugenic practices and ideas 'slip' into contemporary understandings of gender, sexuality, class, disability, and racialization."

10

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

93.    The book's first chapter is entitled Introducing Critical Eugenic Studies.

94.    In the book's first edition, this chapter contains a grossly inaccurate, false, and defamatory depiction of Dr. Amin.

95.    These false and defamatory statements of and concerning Dr. Amin include at least the following:

> The control and management of people's reproduction has [*sic*] had a long history and continues to this day in different areas around the world including in the United States of America. For example, in September 2020 - two years before the *Dobbs v Jackson* (2022) ruling - a whistleblower nurse from Immigration and Customs Enforcement (ICE) at the Irwin Detention Center in Georgia, denounced that "Dr Mahendra Amin committed medical negligence when he forcibly sterilized fifty-seven" detained immigrants at this center (Rahman, 2022: 147). According to the whistleblower and five gynecologists, Dr Amin exaggerated the risk of different health conditions to justify the hysterectomies performed (Rahman, 2022: 147). The hysterectomies performed and the actions of Dr Amin showed that the majority of detained immigrants who underwent these procedures did not fully understand the implications. Nonetheless, the media coverage of this event did not receive nearly as much local or international coverage as *Dobbs v Jackson* (2022). Moreover, nothing has come from activist efforts to call attention to these atrocities as well as to the poor care of people inside of these detention centers before and during the COVID-19 pandemic.
>
> These two examples show that reproductive management in the United States does not come in a vacuum but, instead, responds to a racializing, ableist, classist, and gendered logic that is often silenced or obscured.

96.    The book accuses Dr. Amin of "forcibly steriliz[ing] fifty-seven" women detained at ICDC.

97.    The book claims that a whistleblower nurse from Immigration and Customs Enforcement (ICE) at the Irwin Detention Center in Georgia claimed that Dr. Amin forcibly sterilized fifty-seven women at ICDC.

98.    Dr. Amin did not forcibly sterilize fifty-seven women detained at ICDC.

99.    Dr. Amin did not forcibly sterilize any women.

11

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

100.    No "whistleblower nurse from Immigration and Customs Enforcement (ICE) at the Irwin Detention Center in Georgia" ever claimed Dr. Amin sterilized fifty-seven women at ICDC.

101.    There is no legitimate source upon which the book could rely that Dr. Amin sterilized fifty-seven women without their knowledge or consent.

102.    The book contends that "five gynecologists" reached that conclusion as well as the conclusion that Dr. Amin "exaggerated" his patients' conditions "to justify" the purported fifty-seven hysterectomies.

103.    No gynecologist reached a conclusion that Dr. Amin sterilized fifty-seven women at ICDC.

104.    Because no gynecologist reached a conclusion that Dr. Amin sterilized fifty-seven women at ICDC, no gynecologist could reach a conclusion that Dr. Amin exaggerated his patients' conditions to justify that number of hysterectomies.

105.    The book also contends that Dr. Amin committed "atrocities" upon detained immigrant women who "did not fully understand" what was happening.

106.    Dr. Amin did not commit atrocities upon detained immigrant women.

107.    Dr. Amin did not perform any procedures on any women without informed consent.

108.    Further, the book casts the falsely alleged fifty-seven sterilizations as one of the latest incidents of the history of "control and management of people's reproduction"—i.e., eugenics.

109.    The statements that Dr. Amin sterilized fifty-seven patients without their knowledge or consent are false and defamatory *per se*.

110.    Indeed, even the book itself characterizes Dr. Amin's alleged actions as "medical malpractice."

111.    The statements above are false.  As discussed above, Dr. Amin conducted only two hysterectomies, both of which were necessary and done with

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

the patient's knowledge and consent, as were all of the procedures Dr. Amin performed on ICDC patients.

112.    The defamatory statements above had already been proven false by the time Sage published the book. For instance, Prism (one of the first outlets to name Dr. Amin) published reasons to doubt the veracity of Wooten's claims on September 17, 2020.  Further, the United States Senate Permanent Subcommittee on Investigations had definitively stated that only two hysterectomies had been performed by Dr. Amin on ICDC patients and that ICE had approved both as medically necessary.

113.    Even more damning, on June 26, 2024—nearly six months before the book was released to the public—Judge Lisa Godbey Wood of the United States District Court for the Southern District of Georgia, in the case styled *Amin v. NBCUniversal Media, LLC*, Case No. 5:21-cv-56, issued an opinion granting summary judgment to Dr. Amin on several key claims.

114.    Judge Wood concluded, as a matter of law, that "[t]he undisputed evidence has established that:  (1) there were no mass hysterectomies or high numbers of hysterectomies at the facility; [and] (2) Dr. Amin performed only two hysterectomies on female detainees from the ICDC."  Amin v. NBCUniversal Media, LLC, No. 5:21-CV-56, 2024 WL 3188768, at *16 (S.D. Ga. June 26, 2024), reconsideration denied, No. 5:21-CV-56, 2024 WL 4016377 (S.D. Ga. Aug. 15, 2024). [1]

## FIRST CAUSE OF ACTION AGAINST DEFENDANT
## DEFAMATION

115.    Dr. Amin incorporates by reference paragraphs 1-114 of this Complaint as if fully restated herein.

_____

[1] This opinion also concluded that allegations that Dr. Amin was a "uterus collector" were false, but the book fortunately does not include this heinous misnomer.

13

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA  90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

116.    Georgia law applies to Dr. Amin's defamation claims, as Georgia is the place where Dr. Amin "can be said to enjoy a reputation" so it is Georgia in which "that reputation would suffer injury by the accused writing." <u>Hanley v. Trib. Pub. Co.</u>, 527 F.2d 68, 70 (9th Cir. 1975); <u>see also</u> Restatement (Second) of Conflict of Laws § 150 (1971) ("When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.").

117.    Defendant is responsible for the words it publishes, including the communication of defamatory matter it published in chapter one of the book that was of and concerning Dr. Amin, including the following statements:

(a) For example, in September 2020 - two years before the *Dobbs v Jackson* (2022) ruling - a whistleblower nurse from Immigration and Customs Enforcement (ICE) at the Irwin Detention Center in Georgia, denounced that "Dr Mahendra Amin committed medical negligence when he forcibly sterilized fifty-seven" detained immigrants at this center.

(b) According to the whistleblower and five gynecologists, Dr. Amin exaggerated the risk of different health conditions to justify the hysterectomies performed.

(c) The hysterectomies performed and the actions of Dr. Amin showed that the majority of detained immigrants who underwent these procedures did not fully understand the implications.

(d) Moreover, nothing has come from activist efforts to call attention to these atrocities as well as to the poor care of people inside of these detention centers before and during the COVID-19 pandemic.

(e) These two examples show that reproductive management in the United States does not come in a vacuum but, instead, responds to a

14

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

racializing, ableist, classist, and gendered logic that is often
silenced or obscured.

118. These statements are false.

119. These statements are defamatory.

120. These statements are not privileged.

121. The statements specifically name and identify Dr. Amin.

122. Accordingly, persons who know or know of Dr. Amin would reasonably understand the book to be talking about Dr. Amin, and the statements are of and concerning Dr. Amin.

123. The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that injure his professional reputation.

124. The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that are crimes punishable by law.

125. The statements constitute defamation in that they directly and/or implicitly impute actions to Dr. Amin that are defamatory and injurious to his reputation on their face and can be so understood without reference to any additional or extrinsic facts.

126. Defendant negligently and maliciously published the statements, which have been discredited.

127. Defendant had actual knowledge that the accusations against Dr. Amin were false prior to publication, as was reported by widespread media coverage, the United States Senate Permanent Subcommittee on Investigations, and concluded as a matter of law by a federal judge.

128. Defendant published the statements with actual malice.

129. Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin that contradicted known facts.

130. Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin without any source.

15

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

131.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant knowingly and purposely avoided the truth and ignored evidence establishing the falsity of the statements prior to their publication.

132.    Evidencing a reckless disregard for truth or falsity, Defendant published the accusations against Dr. Amin without conducting even a cursory investigation, which failure constitutes gross negligence in light of the accusations having been refuted.

133.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin that were so inherently improbable on their face as to raise serious doubts about their truth.

134.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin that were so outrageous on their face as to raise serious doubts about their truth.

135.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin without seeking his comment or participation.

136.    Defendant financially benefited from the book's allegations against Dr. Amin, by purportedly supporting the book's argument and making the book more salacious.

137.    On March 21, 2025, Dr. Amin sent via email and Federal Express a letter to Sage informing it of the falsity of the book's statements about Dr. Amin, which it should have already known, and demanding that Sage and Dr. Sanchez-Rivera retract the statements and cease and desist publication.

138.    Defendant did take steps to cease distribution of the defamatory book and issued a corrected second edition.

139.    But Defendant did not take any steps to remedy the harm already caused to Dr. Amin by the publishing, sales, and circulation of the book's initial version.

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA  90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

140.   The book was published to third parties, and the defamatory statements therein were, in fact, viewed by third parties.

141.   As set forth above, the book's statements about Dr. Amin are defamatory and libelous *per se*, entitling Dr. Amin to presumed damages.

142.   As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin has suffered special damages, including but not limited to employment losses, medical treatment, and costs of reputational defense, which were the natural and proximate consequence of the language Defendant used.

143.   As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin's personal reputation and his reputation as a physician have been permanently damaged.

144.   As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin has suffered stress, emotional distress, embarrassment, humiliation, anger, and other mental pain and suffering.

145.   As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin has suffered public hatred, contempt, scorn, and ridicule.

146.   Dr. Amin continues to fear for his safety.  He fears that people are following him and talking about him in public.

147.   The conduct of Defendant demonstrates oppression, fraud, and malice by, for instance, publishing false and defamatory statements about Dr. Amin that had already been disproven.

148.   The false and defamatory accusations were published with constitutional actual malice, thereby entitling Dr. Amin to an award of punitive damages.

149.   Dr. Amin is also entitled to an award of punitive damages to punish Defendant for its unlawful conduct and to penalize and deter it from repeating such unlawful and egregious conduct.

17

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

WHEREFORE, Dr. Amin demands:

(a) Trial by jury;

(b) That judgment be entered against Defendant for presumed and compensatory damages in an amount not less than $1,000,000.00;

(c) That judgment be entered against the Defendant for punitive damages in an amount to punish and penalize it and deter it from repeating its malicious, oppressive, and fraudulent conduct;

(d) That all costs of this action be assessed against the Defendant;

(e) That Dr. Amin be awarded his reasonable costs and attorneys' fees incurred in pursuing this action; and

(f) That this Court award such other relief as it deems equitable, just, and proper.

Dated:  December 2, 2025

SPERTUS, JOSEPHS & MINNICK, LLP

By: _____

Samuel A. Josephs
Payton J. Lyon

Stacey G. Evans
*Pro hac vice* application forthcoming
Ryan E. Harbin
*Pro hac vice* application forthcoming
J. Amble Johnson
*Pro hac vice* application forthcoming

Attorneys for Plaintiff
Dr. Mahendra Amin, M.D.,

Spertus, Josephs & Minnick, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone (213) 205-6520; Facsimile (213) 205-6521

18

*COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL*